UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| HARRIETT POOLER | CIVIL CASE NO. |
| v. | JUDGE: _____ |
| THE NATURE CONSERVANCY | MAGISTRATE: _____ |
| | DEMAND FOR JURY TRIAL |

**COMPLAINT**

**NOW INTO COURT**, through undersigned counsel, comes the Plaintiff, Harriett Pooler, who respectfully submits her complaint against The Nature Conservancy ("Conservancy"), for sexual harassment, sexual discrimination, retaliation, and wrongful termination, in violation of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e *et seq*).

**PARTIES**

1. Harriett Pooler (hereinafter "Pooler"), is a person of the full age of majority and a citizen and resident of Baton Rouge, Louisiana. Pooler belongs to a protected class under Title VII as a female.

2. The Nature Conservancy (hereinafter "Conservancy"), is a 501(c)(3) non-profit conservation organization or cooperative domiciled in the State of Washington with its principal place of business in the State of Virginia. It does business in Baton Rouge, Louisiana. The Conservancy is an employer within the meaning of 42 U.S.C. § 2000e(b). The Conservancy employs a total of approximately 3,700 employees throughout 50 states and in 37 countries outside of the United States.

## JURISDICTION AND VENUE

3. This court has subject matter jurisdiction pursuant to 42 U.S.C. § 2000e *et seq.*, and 28 U.S.C. § 1331, §1332, and § 1343.

4. Venue is proper under 28 U.S.C. § 1391(b) in that a substantial part of the events and/or omissions giving rise to the plaintiff's claims occurred in this judicial district, specifically in Baton Rouge, Louisiana.

## FACTUAL ALLEGATIONS

5. Pooler began her employment with the Conservancy on December 28, 2009, as a Donor Relations Manager ("DRM") in the Louisiana chapter's Baton Rouge office. Pooler was always a dedicated employee who performed her job diligently and with her employer's best interests in mind.

6. At the time Pooler was hired, Don McDowell was the Director of Philanthropy (DOP); he led Pooler to believe that she would succeed McDowell when he retired a year later. Pooler, had previously been employed by the LSU Foundation where she had extensive interactions and trainings on corporate and foundation relations in higher education with multi-million dollar fundraising proposals. On many occasions Pooler shared her ideas and strategies with McDowell for securing funds from corporations and area foundations, which were implemented, and which eventually resulted in millions of dollars of donations to the Conservancy. After four months of working with McDowell, he informed Pooler that he had no intention to retire soon, and had simply told her that to get her to accept the DRM position because he needed someone with her experience. When the DOP position ultimately became available, Lisa Creasman, Director of Strategic Initiatives, asked Pooler to apply because she had a good fundraising track record. However, Laura Lanier was ultimately selected for the position.

2

Both Ouchley and Creasman told Pooler that the reason that Lanier had been selected for the position was that she was more qualified, and that she had CFRE (certified fund raising executive) credentials, which was untrue.

7.  During Pooler's employment with the Conservancy, she was the victim of sexual harassment by Dr. Peter Kareiva, the Conservancy's Chief Scientist, as described more fully hereinbelow.

8.  During Pooler's employment with the Conservancy she was also the victim of sexual harassment and retaliation, was denied promotions, was denied opportunities to advance within the organization, and was ostracized by her co-workers as a result of Ouchley exaggerated and derogatory comments of a sexual nature about Pooler to co-workers, other Conservancy employees, and Conservancy board members.

9.  In September of 2012, Jolie Sibert, Director of the Coda Fellowship program ("CF"), contacted Pooler to request that she apply for one of three Coda Fellowships (a Conservancy program that allowed employees to take on short-term global assignments in addition to their regular work), that Dr. Kareiva was posting because Dr. Kareiva wanted to meet Pooler. Pooler complied with Sibert's request and was selected for the Coda Fellowship.

10. Pooler initially met Dr. Kareiva (in connection with the Coda Fellowship program) at a dinner meeting which occurred in St. Louis, Missouri, in October, 2012. At that time, Pooler also met Conservancy board member Dr. Roy Vagelos, who told her that Dr. Kareiva had invited him along to possibly fund a job for her. Dr. Kareiva told Pooler that he had chosen her because she helped save rainforests in Colombia. During dinner Dr. Kareiva also told Pooler that he had been looking for someone for a long time; that he liked her; that he did not talk to his wife, and that he would talk to her instead. He also asked her to join his Science

3

Council which met monthly, but Pooler declined. Dr. Kareiva then informed Pooler that he had called an old boyfriend of hers to inquire about her. He expressed a desire to have sex with her, but Pooler rebuffed his advances. At that time, Pooler told Dr. Kareiva that she would sue him if he did not discontinue his inappropriate conversation about sex.

11. Later that evening while still at dinner, Dr. Kareiva repeatedly insisted that Pooler tell Dr. Vagelos personal things about herself that she normally does not share with others, in order to secure a donation from Vagelos. However, Dr. Kareiva became very upset with Pooler when he learned that she had already secured a $10 million dollar verbal commitment from Dr. Vagelos for one of Dr. Kareiva's programs. Dr. Kareiva made derogatory comments of a sexual nature to Dr. Vagelos. Dr. Vagelos responded by telling Pooler that he did not want any negative publicity for the Conservancy, and that he would help her to get over Dr. Kareiva's abuse, and help her with the funds for therapy. He advised Pooler to go to the EEOC, and explained to her his understanding as to how the EEOC process worked. Despite Pooler's fear of losing her job, she told Dr. Vagelos that she would report the sexual harassment to the Conversancy Human Resources office upon her return to Louisiana. Dr. Kareiva then began telling Pooler that she was going to lose her job, and that her career at the Conservancy was over; and he asked her what she was going to do without a job. The humiliation, pain, and threat of losing her job caused Pooler to have a painful flashback of childhood sexual abuse.

12. Later, both Dr. Vagelos and Fran Ulmer, Global Board Member and Chair of Natural Capital Partnership Review, who was also present at the dinner, told Pooler that they would inform Mark Tercek, the Conservancy's President & CEO, about Dr. Kareiva's inappropriate behavior.

13. Meanwhile, George Gill, one of the Conservancy's donors, wanted to leave a substantial donation to the Conservancy upon his death. Gill also wanted to donate a subdivision lot to the Conservancy that would be designated as a "tradeland." While working with Pooler, Gill confided to her that the estate was worth $8 million dollars and that half was going to World Wildlife Fund and half was going to the Conservancy. Gill told Pooler that he was glad that she was easy to work with because he had considered taking the Conservancy out of his will because the tradeland's deal had been so difficult. When Gill passed away on August 20, 2012, McDowell wrote to the World Office and requested that $1 million dollars of Gill's estate be given to the Conservancy office since he had worked with Gill on his estate plan and the tradelands deal.

14. In January of 2013, at a Coda Fellowship meeting in Miami Florida, Dr. Kareiva told Pooler that if she thought she was going to be the next DOP, she was wrong; that was not going to happen because he had told Ouchley that he wanted Pooler to work with him. Dr. Kareiva told Pooler that he was going to let the other two women, who were working on the Coda Fellowship, give their reports in June, 2013, but that she was going to have to attend the meeting in Washington, D.C., in October, 2013, to give her report. Dr. Kareiva further informed Pooler that she was going to have to attend the meeting in New Orleans in February, 2014 as well, or she would be fired. Pooler told Dr. Kareiva that she would not go to the meeting in October, 2013, or February, 2014, as the Coda Fellowship ended in June, 2013.

15. In mid-June, 2013 a few days prior to attending the Science Council meeting, by invitation along with the two (2) other Code fellows, in Gateway, Colorado at Canyon Resort, Pooler, who knew that Dr. Kareiva would be in attendance, told McDowell that she was not looking forward to seeing him again because of his inappropriate sexual behavior towards her in

5

the past. She also told McDowell that she had threatened to sue Dr. Kareiva if he did not stop sexually harassing her. McDowell advised Pooler to tell Ouchley about the sexual harassment. In the meantime, McDowell had informed Ouchley about the sexual harassment, who then informed Tercek.

16. At the June 19, 2013, Science Council meeting in Gateway Colorado, Tercek, began yelling at Pooler, in the presence of co-workers, individuals who did not work for the Conservancy, and prominent global board members, most of whom she had never met before, asking her why she had not gone to the EEOC with her complaint about Dr. Kareiva, as Dr. Vagelos had suggested. Tercek also asked Pooler who her attorney was, and she informed him that she had no intention of suing, and that she had just told Dr. Kareiva that to get him to stop harassing her. Tercek then began yelling at Pooler that she was going to lose her job, and he asked her if she were a Lesbian, and told her that they were going to start a LGBT group. He also informed her that they usually fire people who threaten to sue. Tercek then told Pooler that it was his understanding that she had been involved with Gill's estate gift to the Conservancy. When Pooler confirmed this, he told her that when money was donated to the Conservancy without naming a beneficiary state, the Conservancy's World Office does not give the money to the state, ordinarily, but in this case he would give the $1 million to the Louisiana Conservancy if Ouchley did not hire Pooler as the DOP. Tercek's comments caused Pooler to suffer yet another flashback, and caused her to faint. No one from the Conservancy asked Pooler her if she needed medical attention, or even bothered to offer her assistance. Tercek then asked Pooler what she thought an attorney would say when she told him that she had fainted and that no one had offered her medical help. Pooler asked Dr. Kareiva to stop, but he continued to say that she was going to have sex with her attorney. Pooler then told Dr. Kareiva a second time that she was

going to sue him if he did not stop, which he did. Tercek then told Pooler that he had had someone befriend her on Facebook sometime between December 2012 and June, 2013, in order to learn more about her. Tercek then revealed many personal things that he had learned about Pooler by viewing her Facebook page. Next, Tercek told Pooler that she might have to not work for the Conservancy for a while, and that if she lost her job she could come back and have whatever job she applied for if she did not sue them in the meantime.

17. Upon Pooler's return to the Louisiana office a few days later, she learned that Dr. Kareiva had called Ouchley and told him that Tercek had been "ugly" to her. In that conversation, Dr. Kareiva repeated to Ouchley what had transpired between Tercek and Pooler in the Science Council meeting in Colorado, and asked Ouchley to make Pooler talk about it. Ouchley then shared this information with office personnel, McDowell, Lanier, King, and others. As a result, McDowell, King and Lanier began harassing Plaintiff about the incident, and asking her if she was going to sue.

18. On June 28, 2013, Dr. Kareiva authorized a $500 bonus for the Central Science Division for all three Coda Fellows in recognition of their successful project.

19. Throughout her employment with the Conservancy, Pooler was successful in securing millions of dollars in donations.

20. Throughout her employment with the Conservancy, Pooler expressed her concerns to her colleagues that the staff was unprofessional and unpolished.

21. Throughout her employment with the Conservancy, Pooler expressed her concerns to her colleagues about her current position, asserting that she was over-qualified, under-utilized, and not recognized for her contributions.

22.     Throughout her employment with the Conservancy, Pooler was excluded from committees and meetings around the office due to Ouchley's negative treatment of her.

23.     In January of 2014, Creasman and Ouchley, contacted Matt Klage, Regional Human Resources Manager for Central U.S. Division, to inform him of purported performance issues they allegedly observed regarding Pooler.

24.     On February 3, 2014, after Pooler was denied the DOP position, Ouchley began commenting to Pooler that he did not need another fundraiser, meaning her. At that time, Pooler suggested to Ouchley that because she was already responsible for many of the communications responsibilities, that she be moved to a communications position, but this was not done.

25.     In February of 2014, after Pooler was denied the DOP position, and began exploring other positions within the Conservancy, Ouchley became upset with her because at that time she was assisting Laura Lanier in getting acclimated to perform the job she had previously been promised. However, earlier in her employment with the Conservancy, when Pooler had learned that McDowell would not be retiring, Ouchley had encouraged her to explore other positions, and had told her that she could use his name as a reference for any position for which she was interested in applying.

26.     On February 3, 2014, Ouchley, Creasman and Lanier met with Pooler to discuss purported performance issues. They explained to Pooler that they believed that her behavior was unacceptable and was impacting her ability to work with other colleagues in the Baton Rouge office. However, no documentation was presented to Pooler describing or substantiating any performance deficits. These three persons informed Pooler that they were losing confidence in her ability to interact with donors and to contribute to a scheduled new national campaign due to her concerns about her current position. Pooler was offered the option of resigning and taking a

8

financial settlement, to be negotiated later, or to agree to a performance improvement plan ("PIP"), and to be put on probation. Pooler felt that she had no other option but to participate in the performance improvement plan, which she did.

27.     On February 11, 2014, Creasman and Laura Lanier met with Pooler to inform her that they no longer needed her for fundraising, but because her fundraising had been successful in the past, she now needed to help Laura Lanier learn about the donors and how to be successful. Both Creasman and Lanier were very hostile towards Pooler, and told her about various petty things that they blamed her for doing wrong, such as not going to lunch with Lanier, and keeping her door half closed.

28.     On March 18, 2014, Ouchley, Creasman and Lanier met with Pooler to discuss her progress on the PIP. Despite the fact that Pooler had made progress in several areas, these three persons claimed that she had failed to improve her behavior with respect to making negative comments about her job, her colleagues, and the donors. Consequently, Pooler's PIP was extended for an additional sixty (60) days ending on May 23, 2014.

29.     On March 20, 2014, Pooler called Klage to ask if she could be removed from probation, and he told her that he did not know anything about any probation, and that if she had not heard from Human Resources, then she was not on probation. Pooler told Klage that she felt as though she were being harassed by Ouchley, and he told her that he would call Ouchley, but she asked him not to do so for fear of further retaliation.

30.     On April 4, 2014, these three persons and Ms. Wright, the Director of Finance for the Louisiana Chapter, alleged that they had received an email from Pooler wherein she had fabricated a story to Wright that Tercek had authorized a bonus for Pooler for her work as a Coda Fellow. Defendant's claim that Pooler fabricated this email is false. Thereafter, Ouchley

9

authorized that Pooler be terminated effective April 8, 2014.

31. On June 24, 2014, Pooler timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") in accordance with Title VII, 42 U.S.C. § 2000e *et seq.*, alleging the unlawful employment practices as described herein.

32. The Equal Employment Opportunity Commission issued a Notice of Right to Sue on April 5, 2016.

33. Pooler brings this action within 90 days of the Agency's April 5, 2016, Notice of Right to Sue in compliance with and pursuant to Title VII, 42 U.S.C. § 2000e-5(f).

## FIRST CAUSE OF ACTION: "QUID PRO QUO" HARASSMENT

34. Pooler realleges, and incorporates by references paragraphs 1-33 above, inclusive, as if fully set forth herein.

35. During the course and scope of Pooler's employment at the Conservancy, Pooler was the victim of repeated sexual harassment by Dr. Peter Kareiva, the Conservancy's Chief Scientist, in violation of Title VII of the Civil Rights Act of 1964, § 701 *et. seq*, 42 U.S.C. § 2000e *et seq.*. See also 29 C.F.R. § 1604.11.

36. The aforementioned harassment included threats or insinuations that employment benefits would be granted or denied based on sexual favors.

37. The actions of the defendant were deliberate and in reckless disregard of plaintiff's federally protected rights in violation of 42 U.S.C. § 2000e *et seq.* Therefore, plaintiff should be awarded such punitive damages as this court deems necessary and proper.

## SECOND CAUSE OF ACTION: HOSTILE WORK ENVIRONMENT

38. Pooler repeats, realleges, and incorporates by references paragraphs 1-33 above, inclusive, as if fully set forth herein.

39. During the course and scope of Pooler's employment at the Conservancy, Pooler's supervisor(s), harassed her, creating an intimidating, oppressive, hostile and offensive work environment, which interfered with Pooler's emotional and physical well being.

40. The Conservancy failed to take all prompt, effective, and reasonable measures to eliminate sexual harassment from the workplace and to prevent it from occurring in the future after being notified several times of ongoing sexual harassment against Pooler, and therefore discriminated against Pooler. The Conservancy, therefore, in violation of 42 U.S.C. § 2000e *et. seq.*

41. As a direct, natural, proximate and foreseeable result of the Conservancy's action and inaction, Pooler has suffered past and future pecuniary losses, emotional pain, suffering inconvenience, mental anguish, loss of enjoyment of life, loss of dignity and other non-pecuniary losses and intangible injuries.

### THIRD CAUSE OF ACTION: RETALIATION

42. Pooler repeats, realleges, and incorporates by references paragraphs 1-33 above, inclusive, as if fully set forth herein.

43. During the course and scope of Pooler's employment with the Conservancy, Pooler's supervisor(s) repeatedly retaliated against Pooler for reporting Dr. Kareiva's sexually harassing and hostile conduct towards her that violated Title VII and La. R.S. 23:332. Keith Ouchley and Mark Tercek's conduct constitutes retaliation in violation of 42 U.S.C. § 2000e-3(a) and La. R.S. 23:332.

44. The Conservancy retaliated against Pooler when they terminated Pooler's employment. The stated reason for terminating Pooler was not true, but was rather a pretext to mask the Conservancy's discriminatory animus, and was done in retaliation for Pooler's repeated reports of sexually harassing and hostile conduct by Dr. Kareiva in violation of 42 U.S.C. § 2000e *et seq.* and La. R.S. 23:332.

45. As a direct, natural, proximate and foreseeable result of the Conservancy's behavior, Pooler has suffered past and future pecuniary losses, punitive damages, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, loss of dignity and other non-pecuniary losses and intangible injuries.

## JURY DEMAND

46. The Plaintiff respectfully requests trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff, Harriet Pooler, respectfully prays that this court, after due proceedings, enter the following orders in accordance with the provisions of Title VII, 42 U.S.C. § 2000e *et seq.* and La. R.S. 23:332:

- A. Declaring the rights of the parties and finding that the aforementioned conduct of the Defendant was and is violative of Title VII, 42 U.S.C. § 2000, *et seq.*;

- B. Ordering the Defendant to pay Plaintiff back pay, fringe benefits, and legal interest, to reinstate the Plaintiff, or pay the Plaintiff front pay in lieu of

C.  reinstatement, pay the Plaintiff compensatory, special damages, and punitive damages, legal interest, attorney's fees, costs and litigation expenses; and

D.  Ordering such other and additional relief as this Court deems necessary or proper.

Respectfully Submitted:
SMITH LAW FIRM

_____
J. ARTHUR SMITH, III(#07730)
830 North Street
Baton Rouge, Louisiana 70802
Telephone: (225) 383-7716
Facsimile: (225) 383-7773
E-mail: jasmith@jarthursmith.com
*Counsel for Plaintiff, Harriett Pooler*

13